IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NATIVE AMERICAN INDUSTRIAL SOLUTIONS LLC, | : : | |
|     Plaintiff and Counterclaim Defendant | : : | No. 1:17-cv-00677 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| ADVANCED FACILITY MANAGEMENT SERVICES, INC., | : : | |
|     Defendant and Counterclaim Plaintiff | : : | |

## MEMORANDUM

Before the Court are Plaintiff Native American Industrial Solutions LLC ("Plaintiff")'s and Defendant Advanced Facility Management Services, Inc. ("Defendant")'s cross-motions for partial summary judgment. (Doc. Nos. 17, 19.) For the reasons explained herein, the Court will grant Defendant's motion and deny Plaintiff's motion and enter judgment in favor of Defendant.

## I. BACKGROUND

### A. Factual Background[1]

On March 19, 2014, Defendant, a Pennsylvania corporation engaged in the business of government contracting (Doc. No. 17-1 ¶ 2), submitted a proposal to the Department of Defense, Washington Headquarters Service ("WHS") in response to Request for Proposals No. HQ0034-

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts in response to the numbered paragraphs in the moving party's statement, identifying genuine issues to be tried. Id. The following factual background is largely taken from the parties' statements of material facts and their responses thereto (Doc. Nos. 17-1, 19-2, 23-2, 24-1). The parties' statements of material facts contain specific citations to the respective administrative records at each numbered paragraph.

14-R-0023 (the "RFP") (Doc. No. 19-2 ¶ 2). The RFP was for "administrative, management, professional, and financial management support services" (id.), to be performed at the Pentagon (Doc. No. 21 at 5). Defendant's proposal detailed its capabilities and listed several companies who would contribute to the performance of work identified in the RFP. (Doc. No. 19-2 ¶ 3.) One of the companies listed in the RFP was Plaintiff (id.), a South Carolina limited liability company (Doc. No. 1-1 ¶ 1), with no prior government contracting experience (Doc. No. 19-2 ¶ 5). Defendant was awarded a contract under the RFP on September 30, 2014 (the "Prime Contract"). (Id. ¶ 7.)

Having secured the Prime Contract, on October 3, 2014, Stacey Myers, the chief operating officer of Defendant ("Ms. Myers"), wrote to Jeremy Meyers, the chief executive officer of Plaintiff ("Mr. Meyers"), stating that Defendant was preparing the "Base IDIQ Subcontract" which would be "followed by a Task Order Specific Subcontract." (Doc. No. 19-6 at 2.) Plaintiff was to provide employee recruitment services in support of the Prime Contract. (Doc. No. 19-7 at 2.) On October 10 and 13, 2014, respectively, Plaintiff and Defendant executed Subcontract No. SC-IDIQ-AFMS-NAIS-WHS, the "Base IDIQ Subcontract" referenced in Ms. Myers' October 3, 2014 email to Mr. Meyers (the "Base Subcontract"). (Doc. No. 19-2 ¶ 12.)

The Base Subcontract is an indefinite delivery, indefinite quantity subcontract.[2] (Id. ¶ 9.) While it provides a table of various employment positions and pricing for each category, the Base Subcontract does not identify any specific employment positions for which Plaintiff was to

---

[2] Indefinite delivery, indefinite quantity contracts provide for an indefinite quantity of supplies or services during a fixed period of time. See, e.g., Indefinite Delivery, Indefinite Quantity Contracts, U.S. General Services Administration, https://www.gsa.gov/buying-selling/new-to-gsa-acquisitions/how-to-sell-to-the-government/indefinite-delivery-indefinite-quantity-contracts (last modified Aug. 13, 2017).

begin recruitment efforts. (Doc. No. 4-2.) The Base Subcontract states that it "serves as the master agreement for work to be performed" and that "any and all work to be performed will be authorized only by task orders." (Id. at 2, 3.) The effective date of the Base Subcontract is October 3, 2014, and there are four option years provided that corresponded with the Prime Contract. (Doc. No. 19-2 ¶ 13.) The dates of the four option years provided in the Base Subcontract are: Option Year 1: September 26, 2015 – September 25, 2016; Option Year 2: September 26, 2016 – September 25, 2017; Option Year 3: September 26, 2017 – September 25, 2018; Option Year 4: September 26, 2018 – September 25, 2019. (Doc. No. 4-2 at 3, 4.)

The parties included an order of precedence clause in the Base Subcontract that states: "In the event of an inconsistency between the terms and conditions of this subcontract, resultant task orders, and [Plaintiff's] technical and cost proposals, the inconsistency shall be resolved by giving precedence in the following order: [the Base Subcontract]; [t]he [t]ask [o]rder; [Plaintiff's] technical and cost proposal." (Doc. No. 19-2 ¶ 16.) Paragraph 20 of the Base Subcontract contains a non-solicitation clause that states, in relevant part:

> While services are being performed under any Statement of Work, and for a period of three months thereafter, neither party shall knowingly (either directly or indirectly through a third party) solicit or make any offers for the services of any of the other party's employees, independent contractors or other personnel who have been directly involved in performing or assisting in the performance of services under such Statement of Work, and who becomes known to such party by reason thereof, except with the other party's prior written consent.

(Id. ¶ 15.) The Base Subcontract also contains an "integration clause" in Paragraph 14, that reads: "This Agreement embodies the entire agreement of the Parties. No modification of this Agreement, nor any waiver [of] any rights under this Agreement, shall be effective unless in writing signed by both parties." (Doc. No. 19-4 at 9.)

3

Soon after the parties executed the Base Subcontract, Defendant "tasked" Plaintiff with filling two program analyst positions under the subcontract. (Doc. No. 19-2 ¶ 17.) Despite the Base Subcontract's indication to the contrary, no task order was issued concurrent with this request for work to be performed by Plaintiff. (Doc. No. 4 at 23.) The two program analysts were "required by WHS to support the Facilities Services Directorate, located at the Pentagon." (Doc. No. 19-2 ¶ 18.) The Base Subcontract, however, did not include a labor category and ceiling price, for invoicing purposes, for the two program analyst positions Plaintiff had been tasked with filling. (Doc. No. 23-2 ¶ 22.) In an email sent to Ms. Myers on October 30, 2014, Mr. Meyers acknowledged this missing information, writing that in the Base Subcontract, "there is not a [labor category] or an established ceiling rate" for the program analyst position. (Doc. No. 19-2 ¶ 20.) In the same email Mr. Meyers also asked whether the task order for the two program analyst positions, which had not yet been issued to Plaintiff by Defendant, would establish the labor category and ceiling rate for the program analysts, or if instead the parties would modify the Base Subcontract to include the new labor category. (Id. ¶ 21.)

As of February 2015, Plaintiff had not yet identified candidates for the two open program analyst positions acceptable to the government. (Doc. No. 19-2 ¶ 23.) As a result, on February 10, 2015, Defendant retained an outside recruiting firm, Business Resource and Intelligence Center ("BRIC"), to identify potential candidates for the two program analyst positions. (Id. ¶ 25.) BRIC identified several potential candidates for the positions and sent their resumes to Plaintiff and Defendant for consideration. (Id. ¶ 28.) Two of the candidates identified by BRIC were Tivon Johnson ("Johnson") and Kendrick Walker ("Walker") (id. ¶ 29), both of whom Plaintiff hired on April 13, 2015 to fill the two program analyst positions (id. ¶ 39).

4

On April 17, 2015, Ms. Myers sent Modification 01 to the Base Subcontract ("Modification I") to Mr. Meyers via email. (Doc. No. 19-12 at 2.) Modification I states that its purpose is to add the program analyst labor category to the Base Subcontract (id. ¶ 39), so as to "clarify billing and invoicing amounts" (Doc. No. 19-11 at 2). Modification I also amends the period of performance of the Base Subcontract by changing its effective date from October 3, 2014 to April 13, 2015. (Id.) The period of performance in Modification I contains the same four option years provided in the Base Subcontract as referenced supra. In the email to which Modification I was attached, Ms. Myers wrote, "[a]fter execution, we will initiate a [t]ask order level [subcontract] with the [Performance Work Statement] attached." (Doc. No. 19-12 at 2.) Plaintiff executed Modification I on April 21, 2015 and soon thereafter, Defendant circulated a fully executed version of Modification I to Plaintiff, writing: "Thank You! Fully executed attached. Task [O]rder Level Sub Contract [sic] will be forthcoming." (Doc. No. 19-13 at 2.)

On April 23, 2015, Plaintiff and Defendant executed Subcontract SC-NAIS-15-0001 (the "Task Order").[3] (Doc. No. 19-2 at 10.) The Task Order provides for the two program analysts discussed supra and states that the base period of performance is April 13, 2015 through September 25, 2015. (Id. ¶¶ 47, 48.) This period of performance mirrors the period of performance provided in Modification I to the Base Subcontract in that the period runs from April 13, 2015 through September 25, 2015. (Id.) The Task Order also contains the same four option years as the Base Subcontract. (Doc. No. 19-5 at 6.)

The preamble to the Task Order contains the following statement:

---

[3] Defendant refers to this document as the "task order level subcontract." (Doc. No. 19-2 ¶ 45.) Plaintiff disputes Defendant's characterization of this document as a "task order," stating, "[o]n its face the document is a subcontract and not a task order." (Doc. No 23-2 ¶ 45.) For the sake of clarity, the Court will refer to this document as the "Task Order."

> THIS AGREEMENT, made and entered into this 23[rd] day of April, 2015, by and between Advanced Facility Management Services, Inc.[,] a Veteran Owned SDVOSB organized under the laws of Pennsylvania with offices located at 11368 Williamsport Pike, Suite 1A, Greencastle, PA 17225 (hereafter called AFMS) and Native American Industrial Solutions, LLC, (hereafter called SUBCONTRACTOR, or NAIS) with offices located at 461 Preservation Circle, Pawleys Island, SC 29585 and constituting a subcontract under an agreement between AFMS and NAIS.

(Id. at 2.) Additionally, Paragraph 20 of the Task Order contains a different non-solicitation clause than the non-solicitation clause found in the Base Subcontract, which reads:

> Unless otherwise mutually agreed to by the parties in writing, neither party shall hire or solicit for employment any personnel of each other during the time period specified in paragraph 4 above and for a period of one (1) year thereafter. Accordingly, the parties agree that if either party breaches this clause, the breaching party will promptly pay the non-breaching party liquidated damages in an amount equal to the employee's annual salary (including bonuses and incentive compensation) prior to the breach, such sum being a reasonable measure of the damages reasonably anticipated by the parties.

(Doc. No. 19-2 ¶¶ 49, 50.) This non-solicitation clause differs from the clause found in the Base Subcontract in several ways. First, the period of non-solicitation in the Task Order is one year (id. ¶ 50), whereas the Base Subcontract's non-solicitation period is three months (id. ¶ 15). Second, the Task Order's non-solicitation terms prohibit the solicitation for employment of "any personnel" of the other party. (Id. ¶ 50.) The Base Subcontract, however, contains an exception within the non-solicitation terms that is not present in the Task Order for "employees, independent contractors or other personnel" who have been "directly involved in performing or assisting in the performance of services under such Statement of Work," and who do not become known to such party by reason thereof. (Id. ¶ 15.) Third, the non-solicitation clause in the Task Order contains a liquidated damages award "in an amount equal to the employee's annual salary (including bonuses and incentive compensation)." (Id. ¶ 50). The Base Subcontract's non-solicitation terms do not award liquidated damages in the event of a breach. (Doc. No. 19-4 at

20).  Plaintiff does not remember when it first became aware of the differences between the two non-solicitation clauses.  (Doc. No. 19-2 ¶ 52.)

In January 2016, the parties executed two additional modifications, one to the Base Subcontract and one to the Task Order.  (Id. ¶ 53.)  The modification to the Base Subcontract ("Modification II"), exercised an option year, extending the performance period for the Base Subcontract from September 26, 2015 to September 25, 2016.  (Id. ¶ 54.)  The modification to the Task Order ("Modification III"), clarified billing and invoicing terms for the program analysts and noted that the period of performance under the Base Subcontract had been amended. (Id. ¶ 55.)  On May 12, 2016, the parties executed a second task order, Subcontract No. SC-IDIQ-AFMS-WHS-TO0006, for a third program analyst position (the "Second Task Order").[4] (Id. ¶ 56.)  The Second Task Order contained the same non-solicitation clause found in the Base Subcontract.  (Id. ¶ 57.)

Robert Smith, Defendant's president ("Mr. Smith"), advised Plaintiff on July 22, 2016, that Defendant was terminating its business relationship with Plaintiff and that it would "honor its current period of performance on its current [subcontracts] but will not extend any option periods."  (Id. ¶ 60.)  Mr. Smith's stated reason for doing so was that he had become "frustrated with the continued amount of effort" the subcontract arrangement between Defendant and Plaintiff had taken.  (Id. ¶ 61.)  Mr. Smith asked Plaintiff "not to discuss this contract with any of the government personnel associated with this contract in any manner" stating that Plaintiff would "be subject to legal repercussions."  (Id. ¶ 62.)

On August 26, 2016, Mr. Meyers requested that Defendant authorize him to visit the Pentagon, where Johnson and Walker were performing.  (Id. ¶ 66.)  Mr. Meyers requested this

---

[4] Plaintiff does not dispute Defendant's characterization of this document as a "task order." (Doc. No. 23-2 ¶ 56.)

7

visit in order to conduct performance reviews and interview supervisors. (Id. ¶ 67.) Mr. Meyers visited the Pentagon "on or about August 30, 2016." (Id. ¶ 72.) During this visit, Mr. Meyers met with Johnson and Walker and warned them that they might lose their jobs. (Id. ¶ 73.) On August 31, 2016, a representative from the government contacted Defendant and explained that Plaintiff had informed WHS that Plaintiff "would no longer be working on the contract . . . and that [Plaintiff's] employees would end their employment with his company." (Id. ¶ 77.)

On September 1, 2016, Defendant notified Plaintiff that it was terminating the Base Subcontract.[5] (Id. ¶ 79.) Defendant hired Johnson and Walker on September 1, 2016 and both Johnson and Walker remained in the same positions at the Pentagon providing service for WHS. (Id. ¶ 81.) Plaintiff alleges that in "soliciting and hiring" Johnson and Walker, Defendant "materially breached the non-solicitation provisions of [the Task Order]" and that, because of this breach, Plaintiff has "sustained damages in the amount of the agreed[-]upon liquidated damages provision of [the Task Order]." (Doc. No. 1-1 at 6.)

### B. Procedural Background

On March 16, 2017, Plaintiff filed a complaint in the Court of Common Pleas of Franklin County, Pennsylvania, asserting a breach of contract claim (Count I) and seeking declaratory relief (Count II) that Defendant's termination of the Base Subcontract was "unlawful and without just cause pursuant to [the contract's] terms." (Doc. No. 1-1 at 6, 7.) Defendant filed a notice of removal with this Court on April 14, 2017. (Doc. No. 1.) On April 21, 2017, Defendant filed an answer, as well as a counterclaim for breach of contract against Plaintiff. (Doc. No. 4.) Plaintiff filed an answer to Defendant's counterclaim on May 12, 2017. (Doc. No. 10.) On December 11,

---

[5] Defendant indicates that it "notified [Plaintiff] that [the Base Subcontract] was terminated for default effective immediately." (Doc. No. 19-2 ¶ 79.) Plaintiff disputes that "any cause existed to terminate the contract" but does not dispute that Defendant provided notice of termination for default. (Doc. No. 23-2 at 25.)

8

2017, Plaintiff and Defendant filed cross-motions for partial summary judgment as to Count I (Doc. Nos. 17, 19), along with supporting briefs (Doc. Nos. 20, 21), to which Plaintiff and Defendant respectively filed briefs in opposition (Doc. Nos. 23, 24). Additionally, Plaintiff and Defendant filed briefs in reply. (Doc. Nos. 25, 26). Having been fully briefed, the motions are ripe for disposition.

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 governs the grant of summary judgment. Parties may move for summary judgment on particular claims or defenses, or on a part of each claim or defense. Fed. R. Civ. P. 56(a). Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145-46 (3d Cir. 2007). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion

9

with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 US. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant a motion for summary judgment when the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

When presented with cross-motions for summary judgment, as here, the Court should consider the motions separately and apply the appropriate burden of production to each motion. See Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008). The United States Court of Appeals for the Third Circuit has explained that:

> Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.

Id. at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

### III. DISCUSSION

Plaintiff moves for summary judgment as to Count I (Doc. No. 17), on the basis that Defendant breached the Task Order, specifically its non-solicitation terms, when it hired Johnson and Walker. (Doc. No. 21 at 2). Defendant moves for summary judgment as to Count I (Doc.

10

No. 19), on two grounds: (1) that Defendant did not breach the Task Order by hiring Johnson and Walker because the non-solicitation terms governing the parties are those found in the Base Subcontract (id. at 1.), and (2) that in the alternative, an award of liquidated damages is impermissible here as a matter of law (id. at 2). In order to resolve the pending motions, the Court must assess which non-solicitation terms govern the contracting relationship between the parties.

### A. Pennsylvania Law on Contract Interpretation[6]

In Pennsylvania, a plaintiff "seeking to proceed with a breach of contract action must establish '(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). Under Pennsylvania law, where parties have executed two or more contracts with the apparent intention that the contracts govern a single transaction, the contracts should be construed as a single whole even if executed at different times. See Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999)

When interpreting the terms of a contract in order to resolve a dispute between contracting parties, a court must seek to discover the parties' "objective mutual intent." See Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995). The Third Circuit has held that a court can grant summary judgment on an issue of contract interpretation if the contractual language being interpreted is "subject to only one reasonable interpretation."

---

[6] The parties agree that Pennsylvania law applies to Count I of Plaintiff's complaint. Accordingly, the Court applies Pennsylvania law in determining whether summary judgment is appropriate.

11

Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 521 (3d. Cir. 1999) (citations omitted).

In interpreting a contract, a court undertakes a two-step process. See Sanford Inv. Co., 198 F.3d at 421. The initial inquiry is determining whether the disputed contract terms are ambiguous. Id. A court makes this determination as a matter of law. Baldwin v. Univ. of Pittsburgh Med. Ctr., 636 F.3d 69, 76 (3d Cir. 2011) (citing Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)). A contract term is ambiguous if it is susceptible to "reasonable alternative interpretations." Sanford Inv. Co., 198 F.3d at 421. Where a court determines that a given term is ambiguous, "then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations." Sanford Inv. Co., 198 F.3d at 421. However, under Pennsylvania law, a contract term will not be found to be ambiguous "simply because the parties do not agree upon the proper construction." Weisman v. Green Tree Ins. Co., 670 A.2d 160, 161 (Pa. 1996). Under Pennsylvania law, where a writing is determined to be ambiguous a court may "examine all the relevant extrinsic evidence to determine the parties' mutual intent." Duquesne Light, 66 F.3d at 614 (citing Allegheny Int'l v. Allegheny Ludlum Steel Corp., 40 F.3d 1416, 1424 (3d Cir. 1994)).

In determining whether ambiguity exists in a contract, a court may consider "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." Bohler-Uddeholm, 247 F.3d at 93 (quoting Mellon Bank, 619 F.2d at 1011). The language of the contract provides the "strongest objective manifestation of intent." Baldwin, 636 F.3d at 76 (citing Mellon Bank, 619 F.2d at 1009) (see also Samuel Rappaport Family P'ship v. Meridian Bank, 657 A.2d 17, 21 (Pa. Super. Ct. 1995)

12

(in Pennsylvania, "[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself"). Therefore, where the words of the contract clearly establish the parties' intent, a court does not need to "resort to extrinsic aids or evidence." (Id.) (quoting Am. Eagle Outfitters v. Lyle & Scott Ltd., 585 F.3d 575, 587 (3d Cir. 2009)) (see also Krizovensky v. Krizovensky, 624 A.2d 638, 642 (Pa. Super. Ct. 1993) (stating that "[c]lear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract").

B.   **Arguments of the Parties**

Plaintiff argues that Defendant breached the Task Order when it "hired [Johnson and Walker] within the prohibited time under the non-solicitation provision [of the Task Order]." (Doc. No. 21 at 7.) Plaintiff maintains that the Task Order was a new subcontract between the parties, and therefore, the Base Subcontract's non-solicitation terms and order of precedence clause are inapplicable. (Doc. No. 21 at 3, 4.) In support of this view, Plaintiff advances two arguments.

Plaintiff first avers that the Base Subcontract does not make specific reference to any work to be performed by Plaintiff (id. at 3), and that when Defendant eventually did request for Plaintiff to perform work, the parties executed the Task Order (id. at 3, 4). Second, Plaintiff points to discrepancies between several of the terms of the Base Subcontract and the Task Order, including the non-solicitation provision. (Id. at 4). Plaintiff also maintains that the Task Order "does not refer to or incorporate any part of [the Base Subcontract]," and that the Task Order contains an integration clause stating, in part, that "[t]his subcontract constitutes the entire agreement between the parties." (Id. at 5.) In light of these arguments, Plaintiff urges that the Task Order be construed as a new subcontract between the parties and, therefore, subject to

13

neither the Base Subcontract's non-solicitation terms nor its order of precedence clause. (Id. at 4, 5.)

In support of its motion for summary judgment as to Count I, Defendant argues that it did not breach the Task Order when it hired Johnson and Walker because the Base Subcontract, and not the Task Order, governs the parties' subcontracting arrangement with regard to non-solicitation. (Doc. No. 20 at 1.) As an initial matter, Defendant points out that Plaintiff, in its complaint, omitted any mention of the existence of the Base Subcontract, stating: "[a]s a threshold issue, this Court must establish that [the Base Subcontract] and [the Task Order] constitute an integrated subcontract agreement that, together, governed [Plaintiff]'s performance. While this issue should be straightforward and uncontested, [Plaintiff]'s complaint selectively omits any mention of [the Base Subcontract]." (Id. at 6.)

Defendant next avers that "[t]he unambiguous language of [the Base Subcontract] made clear that <u>any and all</u> work to be performed for Defendant would be authorized later by issuance of task orders to [Plaintiff], and that [the Base Subcontract] would serve as the <u>master agreement</u> for the work to be performed." (Id. at 7.) Defendant also points to the inclusion of the order of precedence clause in the Base Subcontract, which indicated that in the event of an inconsistency between the Base Subcontract and a future task order, the terms of the Base Subcontract would govern. (Id. at 7, 8.) Given the existence of the order of precedence clause, Defendant argues that the Court should determine that the intent of the parties was for the terms of the Base Subcontract to govern in the event of an inconsistency between the Base Subcontract and a task order. (Id. at 17, 18.)

    **C.**    **Whether the Non-Solicitation Terms of the Base Subcontract Govern the Parties' Dispute**

The parties dispute which non-solicitation clause governs their contracting relationship. As detailed above, the differences in the non-solicitation terms between the Base Subcontract and the Task Order are reflected in: (1) the term of the non-solicitation period; (2) which personnel are prohibited from solicitation; and (3) whether an award of liquidated damages is granted in the event of a breach. In its pursuit of the parties' "objective mutual intent," Duequesne Light Co., 66 F.3d at 613, the Court has considered "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning," Bohler-Uddeholm, 247 F.3d at 93 (quoting Mellon Bank, 619 F.2d at 1011). The Court notes that where multiple agreements are determined to govern a single transaction, the agreements should be construed as a single whole, even when executed at different times. See Sanford Inv. Co., 198 F.3d at 421. In conducting its inquiry into which non-solicitation clause governs the parties' dispute, the Court has thus considered the words, alternative meaning provided by counsel, and the nature of the objective evidence offered in support of the meaning of the Base Subcontract, the Task Order, and Modification I, since all three agreements pertain to the filling of the two program analyst positions.

Plaintiff's argument that the Task Order should be construed as a new subcontract because no work was referenced in the Base Subcontract contradicts a plain reading of the Base Subcontract's terms. The Base Subcontract prominently states in its first paragraph, entitled "Agreement Type," that it is "the master agreement for work to be performed" and that "[a]ny and all work to be performed will be authorized only by task orders." (Doc. No. 19-4 at 2, 3.) This language unambiguously indicates that the parties intended for the Base Subcontract to establish the terms that would be at the foundation of the parties' contracting relationship and that those terms apply to "all work to be performed." (Id.) Additionally, the language of the first

15

paragraph demonstrates that the parties intended that all work that was to be performed under the Base Subcontract would be set forth only in task orders. Plaintiff's argument that the Task Order should be construed as a new subcontract because no work was ever authorized by the Base Subcontract is contradicted by the unambiguous language in the Base Subcontract reflecting the parties' intent.

Plaintiff also argues that the differences between several of the terms in the Base Subcontract and the Task Order, including the non-solicitation clauses, indicate that the Task Order should be construed as a new subcontract between the parties. However, the Task Order contains no specific language that indicate it is a new subcontract. The Court notes that the preamble to the Task Order contains language that indicates the opposite:

> THIS AGREEMENT, made and entered into this 23[rd] day of April, 2015, by and between Advanced Facility Management Services, Inc. a Veteran Owned SDVOSB organized under the laws of Pennsylvania with offices located at 11368 Williamsport Pike, Suite 1A, Greencastle, PA 17225 (hereafter called AFMS) and Native American Industrial Solutions, LLC, (hereafter called SUBCONTRACTOR, or NAIS) with offices located at 461 Preservation Circle, Pawleys Island, SC 29585 and constituting a subcontract under an agreement between AFMS and NAIS.

(Doc. No. 19-5 at 2.) The language of the preamble, indicating that the Task Order constituted "a subcontract under an agreement between [Defendant] and [Plaintiff]," is further evidence that the Task Order was not intended to be a new subcontract between the parties, and thus subject to the Base Subcontract's terms. The existence of contradictory terms in the Base Subcontract and the Task Order alone, without other textual support indicating the parties' intent for the Task Order to be construed as a new subcontract, does not overcome the ample evidence indicating that the parties intended that the Task Order was issued under the Base Subcontract.

The text of Modification I also rebuts Plaintiff's contention that the Task Order should be construed as a new subcontract. Modification I states that its purpose is to both clarify billing

16

and invoicing amounts for the program analyst labor category and amend the period of performance of the Base Subcontract. (Doc. No. 19-11 at 2.) Modification I amends the Base Subcontract's period of performance in that it changes the effective date of the period of performance from October 3, 2014 to April 13, 2015. (Id.) Two days after the parties executed Modification I, the parties executed the Task Order. (Doc. No. 19-2 ¶ 45.) The Task Order's period of performance contains the same effective date as the Base Subcontract, as amended by Modification I. (Id. ¶ 48.) Further, the entire period of performance provided in the Task Order, including all option years, aligns directly with the term of the Base Subcontract, as amended by Modification I. (Id.) The parties' intent that the Task Order be subject to the terms of the Base Subcontract is apparent through this deliberate effort by the parties to align the periods of performance in both the Task Order and the Base Subcontract. The Court concludes that the language of Modification I, the Task Order, and the Base Subcontract, implemented by the parties in establishing uniform periods of performance, supports the conclusion that the parties intended for the Task Order to be issued under the Base Subcontract.

The inclusion of the order of precedence clause in the Base Subcontract provides textual support to the view that the parties' intended the Base Subcontract's non-solicitation terms to govern in the instant dispute. The order of precedence clause states that: "In the event of an inconsistency between the terms and conditions of this subcontract, resultant task orders, and [Plaintiff's] technical and cost proposals, the inconsistency shall be resolved by giving precedence in the following order: [the Base Subcontract]; [t]he [t]ask [o]rder; [Plaintiff's] technical and cost proposal." (Doc. No. 19-2 ¶ 16.) The importance of the order of precedence clause in the Base Subcontract is twofold. First, the unambiguous language of this clause further demonstrates that the parties contemplated that work under the Base Subcontract would be

17

authorized by task orders. Secondly, the clause provides conclusive evidence that the parties intended for the terms of the Base Subcontract to be given precedence in the event of an inconsistency between the Base Subcontract and the Task Order, the scenario in the instant case.

The Court concludes that the non-solicitation terms of the Base Subcontract govern the parties dispute. The parties "objective mutual intent," Duequesne Light Co., 66 F.3d at 613, as derived from the text of the Base Subcontract, the Task Order, and Modification I, was that the Task Order was to be subject to the Base Subcontract's terms. The order of precedence clause in the Base Subcontract dictates that in the event of an inconsistency between the Task Order and the Base Subcontract, the terms of the Base Subcontract are to be given precedence. The Court thus determines that Defendant did not breach the non-solicitation terms of the Task Order when it hired Johnson and Walker because, given the inconsistency between the non-solicitation terms in the Base Subcontract and the Task Order, the parties were bound by the non-solicitation terms of the Base Subcontract. Accordingly, the Court will grant Defendant's motion for summary judgment as to Count I of the complaint and deny Plaintiff's motion for summary judgment as to Count I of the complaint.

> **D.** **Plaintiff's Claim for Declaratory Relief and Defendant's Counterclaim for Breach of Contract**

Having concluded that Defendant is entitled to summary judgment as to Count I of the complaint, the Court turns to Plaintiff's remaining claim in Count II of its complaint. Count II asserts a claim against Defendant for declaratory relief that Defendant's termination of the Base Subcontract was "unlawful and without just cause" under the terms of the Base Subcontract. (Doc. No. 1-1 at 6, 7.) Plaintiff alleges that Defendant's "claim to have terminated [the Base Subcontract] 'for cause' is harmful to the reputation of [Plaintiff] in the field of government

contracting and will impede its ability to compete for other government contracts in the future." (Id. at 6.)

Additionally, Defendant asserted a counterclaim against Plaintiff for breach of contract, alleging, inter alia, that Plaintiff breached the Base Subcontract in that Plaintiff "failed to provide support services necessary to accomplish the tasks and associated deliverables required to support [Defendant] and WH," and that Plaintiff "failed to provide qualified personnel necessary to carry out the requirements of [the Base Subcontract] and was thus unable to perform any services under [the Base Subcontract], despite insisting that it had the capabilities to perform under [the Base Subcontract] in order to induce [Defendant] to work with [Plaintiff]." (Doc. No. 4 ¶ 122.) Defendant states that because of Plaintiff's breach, Defendant has suffered monetary damages. (Id. at ¶ 123.)

Having granted Defendant's motion for summary judgment as to Count I (Doc. No. 19), the Court finds that, at this juncture, it is appropriate to direct the parties to specifically address the impact of the Court's disposition of Defendant's motion for summary judgment as to Count I (Doc. No. 19), and Plaintiff's motion for summary judgment as to Count I (Doc. No. 17), on Count II of Plaintiff's complaint and Defendant's pending counterclaim.

## IV. CONCLUSION

For all of the reasons discussed above, Defendant's motion for summary judgment as to Count I of Plaintiff's complaint (Doc. No. 19), will be granted and Plaintiff's motion for summary judgment as to Count I of Plaintiff's complaint (Doc. No. 17), will be denied. An Order consistent with this Memorandum follows.